**SEARS, ROEBUCK AND CO.,**
Petitioner,

v.

**Mike L. BACA, Richard J. Wise, Peter D. Nims, Individually and as members of the Industrial Commission of the State of Colorado, the Industrial Commission of the State of Colorado, Charles McGrath, the Director of the Division of Labor of the State of Colorado, and Mellis R. Dyson, Respondents.**

No. 83SC90.

Supreme Court of Colorado,
En Banc.

April 30, 1984.

Richard B. Rose, John R. Frye, Jr., Denver, for petitioner.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., James R. Hubbard, Robert C. Lehnert, Asst. Attys. Gen., Denver, for respondents.

Scott W. Lawrence, Denver, for respondent Mellis R. Dyson.

ROVIRA, Justice.

We granted certiorari to review the decision of the court of appeals in *Sears, Roebuck & Co. v. Baca,* 670 P.2d 1244 (Colo.Ct. App.1983), dismissing an appeal brought by Sears, Roebuck & Co. (Sears) against the Industrial Commission of Colorado (Industrial Commission or Commission) and the Colorado Division of Labor (Division). The Commission denied as untimely Sears' request for participation by the subsequent

injury fund (SIF or fund) in a workmen's compensation proceeding. Sears sought review of the Commission's order, claiming that the Commission's failure to promulgate rules and regulations governing SIF practice and application violated Sears' due process rights. The court of appeals dismissed Sears' appeal without discussing the due process issue, concluding that the SIF is not a legal entity capable of being joined in workmen's compensation proceedings. We granted certiorari and now affirm in part, reverse in part, and remand for further proceedings.

## I.

The claimant in this case, Mellis Dyson, worked for ten years as a mechanic in the automotive department at Sears. On the advice of his doctor, Dyson discontinued his employment in mid-1979, several months after injuring his left knee in the second of two job related accidents. In 1975, after injuring his left knee for the first time, Dyson received a workmen's compensation award for a thirty-percent permanent partial disability. The second injury occurred on January 10, 1979, when Dyson tripped and fell on his left knee again. Dyson filed a workmen's compensation claim based on this later injury, and a hearing was held on August 28, 1980. At the hearing, two doctors testified as to Dyson's impaired condition. Both concluded that the 1979 accident had resulted in a permanent partial disability at the left knee, yet both felt Dyson could return to work on a limited basis. The referee from the Division disagreed, however, and issued an order on October 9, 1980, stating:

"The medical evidence indicates that the claimant is *permanently and totally disabled* from returning to his life long work as an automobile mechanic. He is severely limited in lifting, must alternately sit and stand in relatively short periods of time, has had four surgical operations on the knee, cannot walk nor-

mally or kneel and has ... limitation of motion of the knee." (emphasis added).
He then ordered Sears to pay Dyson permanent total disability benefits of $173.60 per week for the rest of his life.

Sears filed a petition for review of the referee's order with the Division. On February 12, 1981, while the petition was pending, Sears wrote a letter to the Director of the Division, informing him that, "[f]ollowing the hearing and Order, both parties [Sears and Dyson] have agreed that the factual situation presented falls squarely within the parameters of the subsequent injury fund." *See* section 8–51–106, C.R.S. 1973 (1973 & 1983 Supp.).[1] As a result, Sears expressed a desire "to set in motion whatever process is required by the Division of Labor, in order to establish the subsequent injury fund participation." On April 8, in a second letter to the Director, Sears renewed its request for "subsequent injury fund participation in [Dyson's] permanent total disability award." The Director relayed the request to the referee who presided at Dyson's hearing. On April 17, 1981, the referee responded in a letter to Sears:

"Please be advised that no request was ever made in this case prior to Order that the Subsequent Injury Fund be made a party. The Subsequent Injury Fund was not noticed with respect to the hearing held August 28, 1980, which is the only hearing at which testimony was taken. Neither party raised the question of involvement of the Subsequent Injury Fund at the hearing nor did they take the opportunity of raising this issue in position statements for which time was granted at the close of the hearing. The Order was entered on October 9, 1980, and no issue concerning the Subsequent Injury Fund was raised by the Petition for Review which was filed by [Sears]. This matter is therefore proceeding on appeal upon the issues presented by [Sears'] Petition to Review. The Subse-

---

**1.** This statute creates a special fund dealing with cumulative job-related injuries. It is discussed in detail in Part II.

quent Injury Fund is not a party to the proceedings nor can any issue be raised concerning its participation at this late date."

Sears filed a supplemental petition for review of the referee's letter on May 8, 1981. It asked the referee to reverse his decision of April 17 and "grant [Sears] access to the Subsequent Injury Fund." It argued that since "no time limit for requesting Subsequent Injury Fund participation is contained in either statute or rules of procedure, ... [it appears that] either party may make the request at any time, even while [the original] Petition for Review is pending." At this point, the referee decided to refer both of Sears' petitions for review to the Industrial Commission for a final determination. On January 5, 1982, the Commission affirmed the referee's original order finding the claimant permanently and totally disabled, as well as the April 17, 1981, order "in letter form" denying Sears' "request for participation or joining" of the SIF. After citing a lack of evidence, the Commission concluded that, in any event,

"the request by the parties to join the Subsequent Injury Fund is untimely. It would require re-litigation, to allow that Fund to enter to contest however it might deem necessary. The Commission and the Director of Labor cannot determine the Fund's rights without notice; to do otherwise would be denial of due process. Finally, the delay required by joining the Fund as requested would be inordinate and inappropriate. There is no proof of the necessity to join the Fund or to require its involvement at this stage."

Sears filed a petition to review the Commission's order on January 21, 1982. It argued once again that no statute, rule, or regulation existed which explained the

"mechanics for the invocation of the Subsequent Injury Fund or even how the Fund is to be administered. [Likewise, Sears] can find no statutory or regulatory requirement for requesting joinder

of the Subsequent Injury Fund, nor can [Sears] find any time limits for making such requests .... To adopt what appears to be the Commission's view of the Subsequent Injury Fund procedure would mean that any time a Claimant had a pre-existing compensable injury, a special request would have to be made for Subsequent Injury Fund participation even though the question of permanent total disability had not been decided or, may not even have been requested by the Claimant .... [Under the circumstances,] any denial of Subsequent Injury Fund participation as mandated by [section 8–51–106] would be a denial of due process ...."

On March 24, 1982, the Commission issued a final order dismissing Sears' supplemental petition. The Commission repeated its earlier conclusion that Sears' requests for SIF participation were untimely.[2] It then addressed Sears' due process concerns; however, its comments were prospective in nature:

"As a guideline for future litigants, we observe that the Director or Commission does not have authority to decide issues affecting Subsequent Injury Fund liability or potential liability without that Fund being fully present as a party, with notice and opportunity to participate in accordance with its own rights to due process. All requirements of the statute that affect the Fund's liability must be considered and fulfilled; it follows that the Fund must have a chance fairly equal to any litigant's to be heard on all elements concerning its liability or potential liability. Such requirements indicate that the Fund should be put on notice, and the effort made to join it in the litigation, from the earliest appearance to a party that there is a fair potential of a finding by the referee of permanent total disability of the claimant under circumstances which could impose liability upon the Fund."

2. As additional grounds for its decision, the Commission held that Sears' supplemental petition was not filed within fifteen days after the date of the referee's letter, April 17, 1981, as required by section 8–53–106(3), C.R.S.1973.

The court of appeals agreed that Sears' petition should be dismissed. However, it based its decision on a different rationale than that adopted by the Commission. Instead of focusing on the timeliness of Sears' requests for SIF participation, it characterized those requests as efforts to join the SIF as a party to the proceedings. Resolution of the issues, therefore, depended "upon the existence of the subsequent injury fund as a legal entity susceptible to suit and capable of being joined as a litigant in [workmen's compensation] proceedings." *Sears, Roebuck & Co.*, 670 P.2d at 1245. The court then analyzed section 8–51–106, the statute governing the subsequent injury fund, and compared it to the group of statutes governing the state compensation insurance fund. *See* sections 8–54–101 to –127, C.R.S.1973 (1973 & 1983 Supp.). Unlike the former, section 8–54–105 specifically authorizes the manager of the state compensation insurance fund to sue and be sued on its behalf. The court of appeals concluded that "[t]his disparity of treatment between the two funds ... evidences the legislative intent that the subsequent injury fund be nothing more than a bookkeeping account," *id.* at 1246, rather than a legal entity subject to joinder. It then dismissed the appeal without discussing Sears' due process concerns.

We agree with the conclusion of the court of appeals that the SIF is not a legal entity; however, we disagree with the decision to dismiss Sears' appeal. Complete resolution of Sears' appeal requires not only a determination of whether the SIF can or should be joined as a party, but also whether Sears' due process rights were violated because of the apparent uncertainty, both substantively and procedurally, concerning SIF practice and application in workmen's compensation proceedings.

## II.

The SIF was established in 1919 as a special workmen's compensation fund dealing with cumulative, job-related injuries to the hand, arm, foot, leg, or eye.[3] In 1975, the General Assembly broadened the scope of the statute governing the SIF to include any permanent partially disabling injury.[4] The current version of that statute, and the one at issue in this case, is section 8–51–106, C.R.S.1973 (1973 & 1983 Supp.), which provides:

"**8–51–106. Loss of remaining members—compensation.** (1)(a) In a case where an employee has previously sustained permanent partial industrial disability and in a subsequent injury sustains additional permanent partial industrial disability and it is shown that the combined industrial disabilities render the employee permanently and totally incapable of steady gainful employment and incapable of rehabilitation to steady gainful employment, then the employer in whose employ the employee sustained such subsequent injury shall be liable only for that portion of the employee's industrial disability attributable to said subsequent injury, and the balance of compensation due such employee on account of permanent total disability shall be paid from the subsequent injury fund as is provided in this section.

"(b) In addition to such compensation and after the completion of the payments therefor, the employee shall continue to receive compensation at his established compensation rate for permanent total disability until death out of a special fund to be known as the 'subsequent injury fund', created for such purpose in the following manner: For every compensable injury resulting in death wherein there are no persons either wholly or partially dependent upon the deceased,

**3.** *See* An Act ... Providing for Compensation and Benefits to Employees and Their Dependents for Accidental Injury to or Death of Employees ..., Colo.Sess.Laws 1919, ch. 210, § 76 at 730. This statute remained essentially the same until the General Assembly amended it in 1975. *See, e.g.,* section 8–51–106, C.R.S.1973.

**4.** *See* An Act Concerning Workmen's Compensation ..., Colo.Sess.Laws 1975, ch. 71, 8–51–106(1)(a) at 302 (codified at section 8–51–106(1)(a), C.R.S.1973 (1983 Supp.)).

the employer or his insurance carrier, if any, shall pay to the division the sum of fifteen thousand dollars, to be deposited with the state treasurer, as custodian, into the subsequent injury fund. In the event there are only partially dependent persons dependent upon the deceased, the employer or his insurance carrier, if any, shall first pay such benefits to such partial dependents and the balance of the sum of fifteen thousand dollars, to be deposited with the state treasurer, as custodian, into the subsequent injury fund ....

"(3) In case payment is or has been made under the provisions of this section and dependency later is shown or if payment is made by mistake or inadvertence or under such circumstances that justice requires a refund thereof, the division is authorized to refund such payment to the employer or, if insured, his insurance carrier.

"(4)(a) The sums provided for the subsequent injury fund created by this section shall be used to pay the costs related to the administration of the fund and to make such compensation payments as may be required by the provisions of articles 40 to 54 of this title...."

As indicated, the SIF comes into play only after a worker suffers at least two accidents, each resulting in a permanent partial disability. If the worker is left permanently and totally disabled by the combined effect of his injuries, the statute provides for an apportionment of liability between the affected employer and the SIF.[5] The employer pays compensation only for that portion of the worker's disability which can be attributed to the subsequent injury. The remainder of the worker's permanent total disability award, as well as ongoing compensation payments for the rest of the worker's life, are paid out of the SIF. The statute also establishes a method for funding the SIF. Each time a worker without dependents dies from a job-related

injury, the employer or his carrier is required to pay the amount specified in the statute to the Division. These sums are then deposited with the state treasurer as custodian of the fund.

■ The purpose in establishing the SIF was to provide partially disabled workers with added opportunities for employment. Prior to the fund's creation, an employer who hired a partially disabled worker was responsible for the entire disability award if the worker suffered a subsequent injury and was declared permanently and totally disabled. *See C.F. & I. Corp. v. Industrial Commission,* 151 Colo. 18, 379 P.2d 153 (1962); *Industrial Commission v. Johnson,* 64 Colo. 461, 172 P. 422 (1918). The General Assembly, in creating the SIF, sought to limit the harsh results of this "full responsibility" rule. As the court of appeals has stated:

"Before the fund was established, the last employer was responsible, not merely for the [injury suffered] by claimant while in his employment, but for the entire permanent total disability, resulting from the combination of past and present injuries. · *See Industrial Commission v. State Insurance Compensation Fund,* 71 Colo. 106, 203 P. 215 [ (1922) ].

"Considering this prior status of the law, we find that the purpose of the statute here construed is to enhance the opportunities for employment for partially disabled persons. It seems logical to assume that if the rule were otherwise, employers would be reluctant to hire partially disabled employees because such employees are subject to a substantially increased likelihood of total permanent disability in the event of an industrial accident. We therefore conclude that the legislature intended, by enactment of this statute, to encourage employers to hire partially disabled persons by relieving them of any greater potential liability resulting therefrom."

**5.** *See* Marino, *Primer on Permanent Disability in the Colorado Workmen's Compensation Law,* 57

Den.L.J. 573 (1980).

*Horizon Land Corp. v. Industrial Commission,* 34 Colo.App. 178, 181, 524 P.2d 638, 639–40 (1974).

The first issue in this case is whether the SIF is a legal entity with the legal status to be joined in workmen's compensation proceedings. We address this issue because the court of appeals characterized Sears' requests for SIF participation as requests for joinder of the SIF as a party to the proceedings. *Sears, Roebuck & Co.,* 670 P.2d at 1245. If the SIF is a legal entity, then Sears' attempt to reopen the proceedings after the referee issued his initial order on October 9, 1980, may have been improper. If, however, the SIF is not a legal entity, then Sears' requests for SIF participation should be evaluated in a different context, one in which the analysis centers on Sears' due process rights, rather than on the timeliness of its requests.

After reviewing the entire Workmen's Compensation Act, sections 8–40–101 to 8–66–112, C.R.S.1973 (1973 & 1983 Supp.) (Act), we conclude that the SIF is not a legal entity. The Act makes no provision for the separate legal status of the SIF. Section 8–51–106 establishes the SIF as a special fund; it also provides a method for collecting the monies which go into the fund. While these characteristics are significant in the administrative sense, they do not confer legal status in the absence of other important characteristics. The SIF is not an official state agency. It has no organization, management, or apparent duties to perform. Finally, it has no express statutory right to sue and be sued. The latter is particularly important in determining whether the SIF qualifies as an "artificial person" with the capacity to participate in the litigation of disputes. *See Ivanhoe Grand Lodge v. Most Worshipful Grand Lodge,* 126 Colo. 515, 251 P.2d 1085 (1952) ("Actions may be brought only by legal entities and against legal entities. There must be some ascertainable persons, natural or artificial, to whom judgments are awarded and against whom they may be enforced."). *Accord, Barker v. District Court,* 199 Colo. 416, 609 P.2d 628 (1980);

*Hidden Lake Development Co. v. District Court,* 183 Colo. 168, 515 P.2d 632 (1973).

In contrast to the SIF, the state compensation insurance fund (SCIF), *see* sections 8–54–101 to –127, possesses all of the necessary characteristics of a legal entity. Section 8–54–102 establishes the SCIF and provides for its administration by a "division" under the direction of a "manager." The manager has complete control over the administration of the SCIF and "may do and perform all things ... as fully and completely as the governing body of a private insurance company might or could do." In addition, section 8–54–104 authorizes the appointment of staff personnel, the payment of salaries, and the preparation of a budget. Finally, section 8–54–105 provides that,

"in the name of the division ..., the manager may ... [s]ue and be sued in all the courts of this state, or of any other state, or of the United States, and in actions arising out of any act [or] matter ... in connection with the state compensation insurance fund and the administration, management, or conduct of the business or affairs relating thereto; and shall be authorized to employ counsel to represent the fund in any action."

The difference between the SIF and the SCIF becomes even more apparent when we analyze the treatment in Maryland of that state's SIF statute. As originally enacted, the Maryland statute was substantially the same as section 8–51–106. *See* Md. Workmen's Compensation Code Ann. art. 101, § 66 (1964 Repl.Vol.). In addition, the statute provided that, in any case involving payments from the SIF, the Workmen's Compensation Commission "shall request the Attorney General ... to represent the fund in hearings before it." The issue in *Subsequent Injury Fund v. Pack,* 250 Md. 306, 242 A.2d 506 (1968), was whether this representation provision gave the SIF legal status to appeal adverse rulings. The Maryland Supreme Court decided that it did not:

"The right to take an appeal is entirely statutory, and no person or agency may

prosecute an appeal unless the right is given by statute .... Furthermore, the Fund itself is merely a creature of the General Assembly, and as such, it enjoys only those powers conferred upon it by statute ....

....

"... The narrow question, therefore, is whether the Fund is a 'person.' It is actually nothing more than a glomerate of money, to be disbursed by the State Treasurer on written orders of the Commission. It is not supervised, maintained or protected by a governing board, which is given the authority to appeal, as is the Unsatisfied Claim and Judgment Fund .... Nor is it an agency of the State, created and designated as such by the Legislature, as is the State Accident Fund .... It is not a commission, corporation, trustee or other artificially created 'person.' ...

....

"... Certainly, the language of the statute does not permit us to read into it the right of appeal on behalf of the Fund. If greater safeguards are needed to protect the Fund from invasion by unwarranted awards, it is within the province of the Legislature, and not the courts, to provide such protection."

*Id.* at 309–14, 242 A.2d at 509–11.[6]

In the wake of the *Pack* decision, the Maryland General Assembly amended its SIF statute[7] to permit the fund to appeal adverse rulings. It also established procedures for impleading the SIF as a party in workmen's compensation proceedings. The current Maryland statute provides in part:

"In any case which shall come before the Workmen's Compensation Commission involving payments from the fund, it shall request the Attorney General to furnish a member of his staff to represent the fund in hearings before it .... In the event of any award against the Subsequent Injury Fund, there shall be a right of appeal by the Subsequent Injury Fund, as provided in ... this article. In any case involving payment from the fund, the Commission, or any party in interest, shall notify the State Treasurer and/or the attorney or attorneys for the fund, in writing, that the fund is, or may be involved in such case, and implead the fund, in writing, as a party. The fund may be impleaded at any stage of the proceedings, either before the Commission, or on appeal ...."

Md. Workmen's Compensation Code Ann. art. 101, § 66(5) (1983 Supp.). In addition, the current Maryland statute provides for a SIF staff and budget and for a SIF Board to "supervise the operation and administration of the Subsequent Injury Fund." *Id.* § 66(7).

 The characteristics of legal status evident in the SCIF and Maryland SIF statutes are missing in section 8–51–106. We conclude, therefore, that the SIF is not a legal entity with the capacity to sue and be sued. Still, there must be some mechanism for enforcing the provisions of section 8–51–106. There also must be some mechanism for enforcing section 8–52–108(1), C.R.S.1973,[8] which establishes certain sub-

---

**6.** In *Maryland Port Administration v. C.J. Langenfelder & Son, Inc.*, 50 Md.App. 525, 438 A.2d 1374 (1982), the Maryland Court of Special Appeals compared the legal status of the Maryland Port Administration (MPA) to that of the SIF in *Pack*. The court noted that the SIF (as of 1968) was not a legally constituted "person" with the right to litigate disputes in court. The MPA, on the other hand, is a designated state agency with a governing structure, substantial duties to perform, and the capacity to sue and be sued in its own name. The court concluded that these qualities give the MPA a "status in law" enabling it to appeal adverse orders.

**7.** *See* 1969 Md.Laws, ch. 394, § 66(5).

**8.** This statute contains the only other reference in the Act to the SIF. It states in part:
"If any employee entitled to compensation under articles 50 to 54 of this title is injured or killed by the negligence or wrong of another not in the same employ, such injured employee or, in case of death, his dependents, before filing any claim under this article, shall elect in writing whether to take compensation under said articles or to pursue his remedy against the other person .... If such injured employee or, in case of death, his dependents elect to take compensation under said articles, the payment of compensation shall operate as and be an assignment of the cause of action against such other person to

rogation rights on the part of the SIF. In our opinion, the person responsible for enforcing sections 8–51–106 and 8–52–108 is the Director of the Division. The Act gives the Director general powers to enforce and administer articles 40 to 54 (including articles 51 and 52). *See* section 8–40–102, C.R.S.1973. It also gives the Director power to appoint referees for the purpose of making any investigation or conducting any hearing on any matter contemplated by articles 40 to 54. *See* section 8–46–107, C.R.S.1973 (1983 Supp.). Finally, the Act provides that the Director can review or reopen any case, hold further hearings, and, if necessary, issue corrected or amended orders. *See* sections 8–53–111 to –113, C.R.S.1973 (1983 Supp.). These general powers, in effect, place the Director in a fiduciary position with regard to the SIF and any other workmen's compensation funds which are not legal entities under the Act.[9] We conclude, therefore, that the Director is the proper party to represent the SIF and to safeguard its interests in workmen's compensation proceedings.

### III.

At the hearing on August 28, 1980, both Sears and Dyson presented arguments concerning whether Dyson had suffered a second, permanent partial disability at the left knee. Neither side anticipated the hearing officer's order declaring Dyson permanently and totally disabled. This unexpected decision prompted Sears, after consultation with Dyson, to write the letters of February 12 and April 8, 1981, requesting "subsequent injury fund participation" in Dyson's disability award. The hearing officer and the Industrial Commission denied Sears' requests as untimely, based on a shared assumption that the SIF is a legal entity. The court of appeals disagreed with their assumption but then dismissed Sears' appeal. As a result, Sears has been denied access to the benefit apportionment scheme in section 8–51–106 for reasons that are not readily apparent. Furthermore, the standard for determining how, when, and where to invoke "SIF participation" in the future remains vague and undefined.[10] In our opinion, Sears' due process rights are implicated by the procedural void surrounding section 8–51–106. This problem represents a serious threat to the policy objectives outlined in *Horizon Land Corp.*, 34 Colo.App. 178, 524 P.2d 638 (1974), and can only be corrected by the promulgation of rules and regulations governing SIF practice and application.

Under section 8–46–108, C.R.S.1973 (1983 Supp.), the Industrial Commission "has the power to adopt reasonable and proper rules and regulations relative to the administration of articles 40 to 54 ... of this title." Despite this statutory authorization, the Commission to date has chosen not to promulgate rules and regulations explaining the procedures that must be followed to assure SIF participation in workmen's compensation proceedings. Under the circumstances of this case, the absence of appropriate administrative guidelines places Sears squarely within the procedural void surrounding section 8–51–106. In our opinion, this void represents a "stumbling block to fundamental fairness" and a violation of Sears' due process rights.

The issue as framed is similar to that addressed in *Elizondo v. State*, 194 Colo.

---

the division of the state compensation insurance fund, major medical insurance fund, or subsequent injury fund, if compensation is payable from said funds .... The right of subrogation provided by this section shall apply to and include all compensation and all medical ... and other benefits and expenses to which the employee or his dependents are entitled...."

Section 8–52–108(2) expressly provides that the SCIF may prosecute or compromise the causes of action assigned to it. There is no similar provision authorizing the SIF to do likewise.

9. *See, e.g.,* the Colorado Medical Disaster Insurance Fund, sections 8–65–101 to –108, C.R.S. 1973 (1973 & 1983 Supp.), and the Colorado Major Medical Insurance Fund, sections 8–66–101 to –112, C.R.S.1973 (1973 & 1983 Supp.).

10. The Commission indicated in its order of January 5, 1982, that the SIF should be "put on notice" or joined "from the earliest appearance to a party that there is a fair potential" that section 8–51–106 might be applicable.

113, 570 P.2d 518 (1977). In *Elizondo,* this court decided that the statute authorizing probationary drivers' licenses,[11] as applied, violated the plaintiff's procedural due process rights, since the Department of Revenue had failed to adopt rules and regulations to guide hearing officers in determining whether to grant or deny probationary licenses. Under another section of the Uniform Motor Vehicle Law, section 42–1–204, C.R.S.1973, the executive director of the department had "the power to make uniform rules and regulations not inconsistent with articles 1 to 4 of this title to enforce the same." The director, however, had not complied with this statutory authorization. We concluded that " '[c]ourts should require ... administrative officers to articulate the standards and principles that govern their discretionary decisions in as much detail as possible.' " *Elizondo,* 194 Colo. at 118, 570 P.2d at 521 (quoting *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 598 (D.C.Cir.1971)). Under the circumstances, due process "require[d]" that the Department "promulgate rules and regulations to guide hearing officers in their decisions" concerning probationary licenses. *Id.,* 570 P.2d at 522. *See also Hide-A-Way Massage Parlor, Inc. v. Board of County Commissioners,* 198 Colo. 175, 597 P.2d 564 (1979) (local governments must adequately define licensing standards for massage parlors); *Friedman v. Motor Vehicle Division,* 194 Colo. 228, 571 P.2d 1086 (1977) (hearing officer must be guided by articulated standards in the form of rules or regulations); *Loesch v. State,* 194 Colo. 169, 570 P.2d 530 (1977) (controlled by *Elizondo;* administrative guidelines required); *Andrews v. Director, Division of Labor,* 41 Colo.App. 408, 585 P.2d 933 (1978) (Industrial Commission should adopt regulations to assist hearing officers in determining when untimely petitions for review can be excused for "good cause"); *Rosenthal v. Department of Rev-*enue, 40 Colo.App. 422, 579 P.2d 1176 (1978) (guidelines insure meaningful review of agency decisions); *Emporium, Ltd. v. City of Colorado Springs,* 40 Colo.App. 414, 576 P.2d 569 (1978) (guidelines inform the public and the courts of what evidence might be considered material by the licensing authority).

The principles expressed in *Elizondo* and its progeny should be applied to this case. Rules and regulations concerning SIF practice and application would insure that employers and claimants are properly informed about how and when to invoke SIF participation in workmen's compensation proceedings. In addition, they would provide guidance to the Industrial Commission in making its decisions and assist the courts in reviewing those decisions. Due process, we have stated, is a flexible standard calling for such procedural protections as the particular situation demands. *People v. Chavez,* 629 P.2d 1040 (Colo.1981); *People v. Taylor,* 618 P.2d 1127 (Colo.1980). *See Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In this case, due process requires that the Industrial Commission promulgate rules and regulations governing the SIF and provide Sears with the opportunity for a hearing pursuant thereto.

The judgment of the court of appeals is affirmed in part and reversed in part. The cause is remanded for further proceedings consistent with this opinion.

KIRSHBAUM, J., does not participate.

---

**11.** Section 42–2–123(11), C.R.S.1973, stated in part:

> "In the event that the driver's license is suspended, the department may issue a probationary license for a period not to exceed the period of suspension, which license may contain such restrictions as the department deems reasonable and necessary and which may thereafter be subject to cancellation as a result of any violation of the restrictions imposed therein."